UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Dexter Armstrong

    v.                                  Civil No. 10-cv-196-SM

Michael Astrue, Commissioner
of the Social Security
Administration


**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Dexter Armstrong moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Commissioner, in turn, moves for an order affirming his decision. I recommend that this matter be remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this report and recommendation.


**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §

405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . .

benefits unless 'the [Commissioner] has committed a legal or

factual error in evaluating a particular claim.'"  Manso-Pizarro

v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting

Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's

findings of fact be supported by substantial evidence, "[t]he

substantial evidence test applies not only to findings of basic

evidentiary facts, but also to inferences and conclusions drawn

from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916,

917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,

730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more

than [a] mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st

Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)).  But, "it is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz, 955 F.2d at 769 (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, doc. no. 20.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Dexter Armstrong was born on February 7, 1988.  When he was four years old, he was diagnosed with the following visual

impairments: anisometropia[1] with amblyopia[2] and exophoria.[3]
Administrative Transcript (hereinafter "Tr.") 228.  Four years
later, he was diagnosed as having microcephaly[4] with
chorioretinal degeneration[5] and decreased vision due to
anisometropic amblyopia.  Tr. 271.  Because of his visual
impairment, Armstrong is not able to drive a car.  Moreover, to
compensate for blurry vision in his left eye, he will often turn
his head so that he is not directly facing something he wants to
look at, in order to focus on it with his right eye only.  Tr.
47, 162.

When Armstrong was nine years old, he took a standardized
intelligence test, the Wechsler Intelligence Scale for Children
("WISC-III"), which revealed a verbal IQ of 52, a performance IQ

---

[1] Anisometropia is "[a] difference in the refractive power
of the two eyes."  Steadman's Medical Dictionary (hereinafter
"Steadman's") 89 (27th ed. 2000).

[2] Amblyopia is "[p]oor vision caused by abnormal development
of visual areas of the brain in response to abnormal visual
stimulation during early development."  Steadman's 55.

[3] Exophoria is a "[t]endency of the eyes to deviate outward
when fusion is suspended."  Steadman's 681.

[4] Microcephaly is an "[a]bnormal smallness of the head . . .
[u]sually associated with mental retardation."  Steadman's 1112.
Claimant's concern over use of the term "mental retardation" is
duly noted but, like claimant, the court uses that term because
that is the term used in the applicable regulations.

[5] Chorioretinal is defined as "[r]elating to the choroid
coat of the eye and the retina."  Steadman's 344.

of 52, and a full scale IQ of 48.  Tr. 239.  The person who

administered Armstrong's WISC-III, however, determined that its

results were "not valid due to interference of visual impairment

and deficits in language."  Tr. 231.

Subsequent intelligence testing, conducted as part of a

psychological evaluation performed by Dr. Kathryn McNally, when

Armstrong was twenty years old, revealed the following results:

> The client's overall performance on the WAIS-III was
> largely in the Borderline range (a Full Scale IQ of
> 71, a Verbal IQ of 71, and a Performance IQ of 76).
> He had particular deficits in the speed with which he
> can process information, and in his ability to hold
> and process information in short-term memory, which
> were both in the Mild Retardation Range.  His verbal
> reasoning and acquired verbal knowledge, as well as
> his nonverbal skills (including fluid reasoning,
> attention to visual detail, and visual-motor
> integration) were both in the Low [N]ormal Range.  A
> relative strength for the client was his nonverbal
> perceptual reasoning, on which he performed in the
> normal range.

Tr. 310.  Dr. McNally diagnosed Armstrong as having Borderline

Intellectual Functioning.  Tr. 311.  She also opined that he had

a good probability of returning to gainful employment if he were

to comply with her recommended treatment,[6] and that he would be

able to return to work in between one and two years.  Id.

---

[6] The treatment Dr. McNally recommended includes: "Further
diagnostic/evaluation studies," Tr. 301; "Continuing treatment
(case management, medications, other)" id.; and referral to
vocational rehabilitation, id.  Dr. McNally further noted: "The
client may benefit with supportive counseling in conjunction
with job training."  Id.

Armstrong graduated from high school in June of 2006.  When he was a high-school student, he was placed in some special-education classes, but he also attended some regular classes, always with an individual aide.  At the time of his graduation, his ability in decoding reading was at a fifth-grade level, and his abilities in reading comprehension, math, and written language were all at a third-grade level.  He cannot use an analog clock to tell time.

The record includes testimony that from 2004 through 2006, Armstrong worked as a bagger at a Hannaford Brothers grocery store.[7]  He was fired from that job for failing to wear proper work clothes on several occasions, and for failing to return from break periods on time.  The wardrobe problem resulted from Armstrong's inability to plan ahead for his clothing needs and his inability to operate a dryer.  The break-time problem resulted from Armstrong becoming distracted and losing track of time.

Dr. Tracey Roettiger completed a Residual Functional Capacity Questionnaire (Visual) for Armstrong on September 22,

---

[7] Payroll records suggest that Armstrong worked at Hannaford from February of 2006 through December of 2007.  See Tr. 141-56.

2008.  She listed three diagnoses: (1) nystagmus;[8] (2) amblyopia; and (3) pigment abnormality in the peripheral fundus.[9]  Tr. 302. She described the first two conditions as being stable, with no chance of improvement, but she was unable to give a prognosis for the third condition.  Id.  She indicated Armstrong's visual acuity, after best correction, as 20/50 +2 in his right eye and 20/60 +2 in his left eye.  Id.  She identified no contraction of peripheral visual fields and described Armstrong's visual symptoms as "[b]lurred vision, poor clarity."  Id.

Dr. Roettiger also reported that Armstrong's symptoms were constantly "severe enough to interfere with attention and concentration needed to perform even simple work tasks."  Tr. 303.  Regarding work activities, Dr. Roettiger reported that Armstrong could constantly perform work activities involving depth perception and accommodation, frequently perform activities involving field of vision, and occasionally perform activities involving near acuity and far acuity.  Id.  She did not know how frequently Armstrong could perform activities involving color vision.  Id.  She further reported that Armstrong could avoid ordinary hazards in the workplace, had no

---

[8] Nystagmus is an "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component." Steadman's 1246.

[9] The "fundus oculi" is "the portion of the interior of the eyeball around the posterior pole, visible through the ophthalmoscope."  Steadman's 718.

difficulty walking up and down stairs, could not "work with
small objects such as those involved in doing sedentary work,"
but could work with large objects.  Tr. 304.  Finally, Dr.
Roettiger stated that Armstrong could frequently twist, stoop
(bend), crouch/squat, climb ladders, climb stairs, and balance.
Id.

In a Psychiatric Review Technique Form completed on May 14,
2008, Dr. William Jamieson checked the following boxes: (1)
"Coexisting Nonmental Impairment(s) that Requires Referral to
Another Medical Specialty;" (2) "Insufficient Evidence;" and (3)
"These findings complete the medical portion of the disability
determination."  Tr. 287.

The ALJ conducted a relatively lengthy hearing on
Armstrong's claim, which included the testimony of a Vocational
Expert ("VE") to whom the ALJ posed the following hypothetical
question:

> Let's assume an individual with no exertional
> limitations.  In terms of environmental limitations,
> the individual would need to avoid exposure at
> unprotected heights and dangerous machinery as well as
> working frequently or constantly with small objects
> really due to the visual limitations.  And in terms of
> mental function, they would be limited to
> understanding, remembering and carrying out one and
> two-step repetitive instructions.  In addition, the
> claimant would need almost constant supervision and
> you've heard the testimony.  Where I'm going is a
> person who although is [not] exclusively supervising
> that individual one on one, would be able to divert
> attention on an as needed basis every 10 or 15 minutes

> to maintain consistency of duties, but would not
> necessarily be getting hand over hand instruction or
> direct supervision all the time.  Would, given that
> residual functional capacity, would the claimant be
> able to perform his past relevant work [as a bagger],
> either as he performed that work or as generally
> performed in the national economy?

Tr. 54-55.  The VE answered in the affirmative, and further

stated that his opinion was consistent with the Dictionary of

Occupational Titles ("DOT").  Tr. 55.  In response to

questioning from Armstrong's counsel, the VE also testified that

a regular and frequent inability to keep track of time and

return from breaks would have a negative impact on a person's

ability to work as a bagger, and that making allowances for such

an inability would not be an accommodation that the employer of

a bagger would regularly provide.  Tr. 56.  Finally, the VE

testified that work as a bagger would be precluded by a person's

"regular inability to follow work rules with respect to dress."

Tr. 57.

After the hearing, the ALJ issued a decision that includes

the following findings:

> 3. The claimant has the following severe impairments:
> microcephaly and visual disturbances and cognitive
> impairments (20 CFR 404.1520(c) and 416.9209(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . .

5. After careful consideration of the entire record, I
find that the claimant has the residual functional
capacity to perform a full range of work at all
exertional levels but with the following nonexertional
limitations: with only occasional tasks involving
manipulation of small objects and no exposure to
unprotected heights or dangerous machinery.  The
claimant would be limited to understanding,
remembering, and carrying out one- and two-step
repetitive tasks and also would require close
supervision, which, although not constant, would
necessitate direct supervision every 10 to 15 minutes
as needed to keep the claimant on task.

. . . .

6. The claimant is capable of performing past relevant
work as a bagger.  This work does not require the
performance of work-related activities precluded by
the claimant's residual functional capacity (20 CFR
404.1565 and 416.965).

Tr. 10, 11, 12, 15.  In support of his finding that Armstrong's

mental impairment did not meet or medically equal a listed

impairment, the ALJ discussed each of the four sets of criteria

set out in paragraphs A through D of 20 C.F.R. § 404, Subpart P,

Appendix 1, § 12.05 (hereinafter "§ 12.05").  In particular, he

noted that "[i]n terms of the requirements in paragraph C, they

are not met because the claimant does not have a valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or

other mental impairment imposing an additional and significant

work-related limitation of function."  Tr. 11.  The ALJ did not

provide a narrative analysis in support of his finding that
Armstrong's mental impairment did not equal the paragraph C
criteria.

## Discussion

According to Armstrong, the ALJ's decision should be
reversed, and the case remanded, because the ALJ: (1)
erroneously determined that he does not have an impairment that
equals a listed impairment, i.e., the impairment described in
paragraph C of § 12.05; (2) found that he was capable of
performing his past relevant work in reliance on VE testimony
that was inconsistent with either the DOT or the residual
functional capacity ("RFC") found by the ALJ; and (3) failed to
find that he needs occasional support in order to comply with
workplace rules.  The Commissioner disagrees, categorically.

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for
supplemental security income, a person must be aged, blind, or
disabled, and must meet certain requirements pertaining to
income and assets.  42 U.S.C. § 1382(a).  The only question in
this case is whether Armstrong was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); <u>see also</u> 42 U.S.C. § 1382c(a)(3)(A) (setting out a similar definition of disability for determining eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); <u>see also</u> 42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for determining eligibility for SSI benefits).

In order to determine whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process.  <u>See</u> 20 U.S.C. §§ 404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not

had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

In assessing a disability claim, the [Commissioner]
considers objective and subjective factors, including:
(1) objective medical facts; (2) plaintiff's
subjective claims of pain and disability as supported
by the testimony of the plaintiff or other witness;
and (3) the plaintiff's educational background, age,
and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

As noted, Armstrong challenges the ALJ's step-three

determination that his mental impairment does not equal a

listing, and he also argues that the ALJ committed two different

errors in making the step-four determination that he is capable of performing his past relevant work as a bagger.

A. Equivalence to the Paragraph C Criteria of § 12.05

Armstrong argues that while the ALJ determined that his mental impairment did not meet the paragraph C criteria in § 12.05, the ALJ failed to consider whether his mental impairment equals that listing.  That argument is without merit; the ALJ plainly found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  Tr. 11.  Thus, it falls to the court to decide whether the ALJ's determination that Armstrong's mental impairment does not equal the paragraph C criteria is legally or factually erroneous.

The mental retardation listing at issue here provides, in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

> impairment imposing an additional and significant
> work-related limitation of function.[10]

§ 12.05.  If a claimant's "impairment satisfies the diagnostic

description in the introductory paragraph and any one of the

four sets of criteria [listed in paragraphs A through D], [the

Commissioner] will find that [the] impairment meets the

listing."  Id. § 12.00A.  In this circuit, "[a] claimant

satisfies the second half of the § 12.05(C) test if he or she

has a severe impairment under § 404.1520(c)."  Nieves v. Sec'y

of Health & Human Servs., 775 F.2d 12, 14 n.7 (1st Cir. 1985)

(citing Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984));

see also Bard v. Soc. Sec. Admin. Comm'r, 736 F. Supp. 2d 270,

275 (D. Me. 2010) ("The second element [of paragraph C of §

12.05] requires that Bard have another physical or mental

impairment 'imposing an additional and significant work-related

limitation of function.' . . .  This harkens back to Step 2.").

The Social Security regulations further explain that

medical equivalence may be found in three different ways, only

one of which is potentially applicable here:

> (i) If you have an impairment that is described
> in appendix 1, but–

---

[10] "In cases where more than one IQ is customarily derived
from the test administered, e.g., where verbal, performance, and
full scale IQs are provided in the Wechsler series, [the
Commissioner] will use the lowest of these in conjunction with
12.05."  20 C.F.R. § 404, Subpt. P, App. 1 § 12.00D(6).

        (A) You do not exhibit one or more of the
findings specified in the particular listing, or
        (B) You exhibit all of the findings, but one or
more of the findings is not as severe as specified in
the particular listing,
        (ii) We will find that your impairment is
medically equivalent to that listing if you have other
findings related to your impairment that are at least
of equal medical significance to the required
criteria.

20 C.F.R. § 404.1526(b)(1).[11]

        Finally, whereas § 404.1526(b)(1) sets out a generalized

approach to determining equivalence, applicable to all listings,

there is also a specialized approach to equivalence applicable

to the paragraph C criteria of § 12.05:

        Listing 12.05C is based on a combination of an IQ
        score with an additional and significant mental or
        physical impairment.  The criteria for this paragraph
        are such that a medical equivalence determination
        would very rarely be required.  However, slightly
        higher IQ's (e.g. 70-75) in the presence of other
        physical or mental disorders that impose additional
        and significant work-related limitation of function
        may support an equivalence determination.  It should
        be noted that generally the higher the IQ, the less
        likely medical equivalence in combination with another
        physical or mental impairment(s) can be found.

---

        [11] The other two ways of finding medical equivalence involve
situations where a claimant has "an impairment that is not
described in appendix 1," 20 C.F.R. § 404.1526(b)(2), or where a
claimant has a combination of impairments, no one of which meets
a listing," § 404.1526(b)(3).  The latter way of establishing
equivalence might seem to apply to this case, but Armstrong does
not make a combination-of-impairments argument under §
404.1526(b)(3).

Shontos v. Barnhart, 328 F.3d 418, 424 n.7 (8th Cir. 2003)

(quoting Program Operations Manual Systems ("POMS") § DI

24515.056(D)(1)(C)).[12]  POMS does not indicate the rationale

behind its approach to demonstrating equivalence to the

paragraph C criteria,[13] but, arguably, that specific approach is

more claimant-friendly than the generalized approach set out in

§ 404.1526(b)(1).

     The heart of Armstrong's argument is that where the margin

of error associated with a claimant's IQ test score, or a

phenomenon known as the Flynn effect,[14] creates the possibility

_____

     [12] "POMS are 'publicly available operating instructions for
processing Social Security claims,' and '[w]hile these
administrative interpretations are not products of formal
rulemaking, they nevertheless warrant respect . . . .'"  Peabody
v. Astrue, No. 08-cv-371-JD, 2009 WL 1117172, at *3 (D.N.H. Apr.
23, 2009) (quoting Wash. State Dep't of Health & Soc. Servs. v.
Guardianship of Estate of Keffeler, 537 U.S. 371, 385 (2003);
citing James v. Richman, 547 F.3d 214, 218 n.2 (3d Cir. 2008)).
"Courts defer to POMS provisions unless they are arbitrary,
capricious, or contrary to existing law."  Peabody, 2009 WL
1117172, at *3 (citing Ramey v. Reinertson, 268 F.3d 955, 964
(10th Cir. 2001)).

     [13] There is no apparent support in POMS for Armstrong's
assertion that § DI 24515.056(D)(1)(C) was intended to
compensate for the margin of error in IQ test scores, although
that provision, to some extent, has that practical effect.

     [14] "The 'Flynn effect' is the name given in recognition of
the central role played by Professor James R. Flynn in
discovering and, in a series of fifteen or more publications
between 1984 and today, documenting the fact that IQ scores have
been increasing from one generation to the next in all fourteen
nations for which IQ data is available."  Thomas v. Allen, 614

that an IQ score over 70 actually represents an intelligence

level at or below that threshold, the proper next step in the

analysis is to make an equivalency finding by following the

technique described in the Diagnostic and Statistical Manual of

Mental Disorders for determining the presence of mild mental

retardation when statistical error is present.  Because there is

no legal basis for deviating from the analytical framework set

out in the Code of Federal Regulations and POMS, and because

neither of those authorizes the analytical step Armstrong

invites the court to take, the court necessarily confines itself

F. Supp. 2d 1257, 1275 (N.D. Ala. 2009).  According to Dr.
Flynn,

> as an intelligence test ages – or moves farther from
> the date on which it was standardized ("normed") – the
> mean score of the population as a whole on that
> assessment instrument increases, thereby artificially
> inflating the IQ scores of individual test subjects.
> Stated somewhat differently, IQ scores have been
> increasing over time for reasons that are totally
> unrelated to the actual, "true" intelligence of test
> subjects.

Id. at 1276.  In Thomas, the "petitioner's psychological expert,
Dr. Karen Salekin, testified that she always applies Dr. Flynn's
recommendation to reduce a full-scale IQ score by 0.30 points
for each year elapsed beyond the date on which the test
instrument was standardized ('normed')."  Id.  Ultimately, the
court in Thomas vacated the petitioner's state-court death
sentence, based on Atkins v. Virginia, 536 U.S. 304 (2002), and
held that a court assessing the constitutionality of a death
sentence under Atkins "must also consider the Flynn effect and
the standard error of measurement in determining whether a
[habeas corpus] petitioner's IQ score falls within a range
containing scores that are less than 70 [the cut-off for mental
retardation in Alabama]."  Id. at 1281.

to the question properly before it, which is whether the ALJ's
equivalency determination is legally or factually erroneous.

The ALJ determined that the paragraph C criteria of § 12.05
were not met "because the claimant does not have a valid verbal,
performance, or full scale IP of 60 through 70 and a physical or
other mental impairment imposing an additional and significant
work-related limitation of function."  Tr. 11.  While he also
found that Armstrong's mental impairment did not medically equal
the paragraph C criteria, he did not provide a narrative in
support of that finding.  Nonetheless, that finding is supported
by substantial evidence.

Under the general framework for establishing equivalence
set out in 20 C.F.R. § 404.1526(b)(1), the record plainly
supports the ALJ's determination that Armstrong does not have an
impairment equivalent to that descried by the paragraph C
criteria of § 12.05.  Because Armstrong's IQ score does not fall
within the range specified in paragraph C, § 404.1526(b)(1)
requires that he "have other findings related to [his]
impairment that are at least of equal medical significance" to
that criterion.  Martinez Nater v. Secretary of Health & Human
Services, 933 F.2d 76 (1st Cir. 1991), provides a good example
of equivalence to a listing.  In that case, the claimant's
impairment did not meet the listing for asthma because she did

not have "severe attacks," i.e., attacks requiring therapy in a hospital or emergency room, at least once every two months.  Id. at 78.  But, the court determined that the claimant's respiratory impairment equaled the relevant listing because the record showed that over a period of approximately two years, she had made fourteen visits to her doctor because of asthma attacks and received treatment of the same sort that is generally provided in a hospital setting.  See id. at 78.  In the words of the court: "The only immediately noticeable distinction between these attacks and the 'severe attacks' defined by § 3.00 C is that Mrs. Martinez was treated either at home or in a doctor's office rather than in a hospital.  We fail to see how that distinction alone is dispositive."  Id. (citation omitted).

    Here, the record contains no analog to the fourteen doctor visits the Martinez Nater court determined to be equivalent to the twelve hospital visits required by the listing.  To be sure, Armstrong places great weight on the margin of error and the Flynn effect.  But, at least in cases where claimants have argued that an IQ over 70 actually meets the paragraph C requirement of an IQ between 60 and 70, due to the margin of error, that argument has been met with almost universal disfavor.  See Burns v. Barnhart, 312 F.3d 113, 125 (3d Cir. 2002) (rejecting  claimant's argument that his IQ score of 75,

plus or minus the well-established five-point margin of error, "should be considered to be 70"); <u>Dover v. Apfel</u>, 203 F.3d 834 (unpublished table decision), No. 99-5035, 2000 WL 135170, at *2 (10th Cir. Feb. 7, 2000) ("We note that all of the circuit courts that have considered similar 'margin of error' arguments with respect to Listing 12.05(C) have rejected it.");[15] <u>but see</u> <u>Walker v. Massanari</u>, 149 F. Supp. 2d 843, 847 (S.D. Iowa 2001) (holding that where benefits awarded on account of mental retardation were cut off as a result of recipient scoring 71 on IQ test after previous scores in the low to mid 60s, "the five point margin of error is a relevant indication of Plaintiff's true level of intelligence which is evidence which detracts from the ALJ's finding that Plaintiff's condition no longer meets a

---

[15] The court in <u>Dover</u> cited: (1) <u>Anderson v. Sullivan</u>, 925 F.2d 220, 223 (7th Cir. 1991), for the proposition that the standard-of-error range should not be factored into Listing 12.05(C)'s IQ score because the Commissioner was entitled to rely on the plain language of the regulation; (2) <u>Newland v. Apfel</u>, 182 F.3d 918 (unpublished table decision), No. 97-4339, 1999 WL 435153, at *6 (6th Cir. June 17, 1999), for the proposition that that the claimant was not entitled to "margin of error" because Social Security regulations do not provide for functional equivalency when test scores are specified; (3) <u>Bennett v. Bowen</u>, 884 F.2d 1387 (unpublished table decision), No. 88-3166, 1989 WL 100665, at *4 (4th Cir. Aug. 28, 1989), for its rejection of the claimant's margin-of-error argument, which the court characterized as an assertion that " 'close counts in horseshoes' as well as the Listings"; and (4) <u>Cockerham v. Sullivan</u>, 895 F.2d 492, 495 (8th Cir. 1990), for the proposition that a claimant's IQ score of 71 could not be liberally construed to meet the requirements in Listing 12.05(C).

listed impairment").[16]  If a score of 71 does not meet the
requirement of a score between 60 and 70, it is difficult to see
how a score of 71 equals the requirement of a score between 60
and 70.

Moreover, it seems unlikely that the courts that have
rejected arguments based on the margin of error would regard
arguments based on the Flynn effect any more favorably.  See
Anderson, 925 F.2d at 223 (relying on the plain language of the
regulations); Bennett, 1989 WL 100665, at *4 (rejecting a "close
counts" argument).  Given the notoriety and acceptance of the
Flynn effect in the psychological community, see Thomas v.
Allen, 614 F. Supp. 2d 1257, 1275-81 (N.D. Ala. 2009), it seems
evident that the Social Security Administration has had an ample
opportunity to incorporate Flynn-effect provisions or guidance
into its regulations, but has not done so.  In any event, there
is simply no basis for ruling that a disability determination
that does not factor in the Flynn effect is legally or factually
erroneous.

Section 404.1526(b)(1), however, is not the only way a
claimant can establish equivalence to the paragraph C criteria

---

[16] Armstrong's case, of course, is distinguishable from
Walker.  In Walker, the claimant had IQ scores below 70, the
validity of which was not challenged, before he achieved the
score of 71 that resulted in the discontinuance of his benefits.
See 149 F. Supp. 2d at 845.  Here, Armstrong has never scored
below 70 on a valid IQ test.

of § 12.05; equivalence may also be established through the framework set out in POMS § DI 24515.056(D)(1)(C) (hereinafter "the POMS framework").  Under the POMS framework – which, by its own language, "would very rarely be required" – an IQ score between 70 and 75 can be counterbalanced by a sufficiently strong showing on the second paragraph C criterion.  Presuming that the court of appeals for this circuit would approve the application of the POMS framework in this case, cf. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) ("Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines."); but see Miller v. Astrue, No. 3:07-CV-1093 (LEK/VEB), 2009 WL 2568571, at *14 (N.D.N.Y. Aug. 19, 2009) ("failing to apply the POMS is not legal error"), substantial evidence would still support a determination that Armstrong's mental impairment does not equal the paragraph C criteria.

As a preliminary matter, the POMS framework merely provides that an IQ between 70 and 75 "may support an equivalence determination," and then sets out a balancing test.  The performance of balancing tests, of course, represents the apex of decision-maker discretion, which leaves the results of balancing tests largely insulated from appellate reversal.  See,

e.g., González-Fuentes v. Molina, 607 F.3d 864, 875 (1st Cir. 2010).  In addition, the POMS framework offers no guidance on how to perform its balancing test.  The test seems rarely to have been involved in litigation, so the case law provides little if any guidance on how to perform it.[17]  All that seems certain is that the POMS framework would allow – but not require – a determination of equivalence when a claimant has a work-

_____

[17] In the only case the court could locate in which the POMS framework was actually applied, rather than merely cited, the district court remanded a case to the ALJ based, in part, on the following:

> Here, plaintiff's lowest IQ score of 72 falls within the "s[l]ightly higher" range.  (Tr. 14). Plaintiff testified that he was in special education classes in school, he dropped out in the tenth grade, and that he did not read books or magazines because he could only read three-letter words.  (Tr. 13, 24, 36). Furthermore, Dr. Ehrlich diagnosed plaintiff with a hearing impairment, and Ms. Burner opined that plaintiff suffered from borderline intellectual functioning.  The ALJ found that, "[b]ased on [plaintiff]'s right ear hearing loss and borderline intellectual functioning, [plaintiff was] restricted to the performance of work involving simple instructions and directions in a routine work environment with only occasional contact with the public."  (Tr. 16).  Because plaintiff's IQ score falls within the slightly higher range, and plaintiff's medical records indicate that he suffered from both a mental and physical impairment that imposed an additional and significant work-related limitation, the ALJ's determination that plaintiff does not have an impairment that medically equals any listing is not supported by substantial evidence on the record.

Ryan v. Astrue, No. 4:08-CV-1697 (CEJ), 2010 WL 1254643, at *8 (E.D. Mo. Mar. 24, 2010).

related limitation of function that falls somewhere above step-two severity, which is the level required to meet paragraph C when a claimant's IQ score falls between 60 and 70, but below the step-three listing level.

Here, there is a quantum of relevant evidence that a reasonable mind might accept as adequate to support a determination that Armstrong's visual impairment – the only impairment in this case that could be used to satisfy the second paragraph C criterion – is not sufficiently severe to counterbalance an IQ score above the range stated in paragraph C.  That evidence includes Dr. Roettiger's determination that Armstrong could: (1) consistently perform work-related activities involving depth perception and accommodation; (2) frequently perform work-related activities involving field of vision; (3) avoid ordinary workplace hazards; (4) walk up and down stairs without difficulty; (5) work with large objects; and (6) frequently twist, stoop (bend), crouch/squat, climb ladders, climb stairs, and balance.  Beyond that, there is nothing in the hearing testimony to suggest that Armstrong's visual impairment ever interfered with his ability to work at Hannaford or elsewhere.  There is also contrary evidence, including the fact

that Armstrong cannot drive due to his eyesight, and several of Dr. Roettiger's other findings.[18]

In the final analysis, however, while the ALJ may have been able to make a legally supportable determination that Armstrong's visual impairment was sufficient to meet the second criterion of paragraph C under the balancing test set out in the POMS framework, he was certainly not required to make such a determination, and this court cannot say that he committed a legal or factual error by not doing so.  See Irlanda Ortiz, 955 F.2d at 769 ("the resolution of conflicts in the evidence is for the [Commissioner] not the courts"); Tsarelka, 842 F.2d at 535 (explaining that a court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

In sum, the ALJ's step-three determination that Armstrong's mental impairment does not equal the paragraph C criteria of § 12.05 is supported by substantial evidence.  In so observing, the court remains aware that had Armstrong scored but a single

---

[18] Specifically, Dr. Roettiger also determined that Armstrong's visual impairment would constantly interfere with the "attention and concentration needed to perform even simple work tasks," Tr. 303, that he could only occasionally perform work activities involving near and far acuity, and that he could not "work with small objects such as those involved in doing sedentary work," Tr. 304.

point lower on either the full scale or verbal portion of his
WAIS-III test, his mental impairment would, without question,
meet the paragraph C criteria.

## B. Vocational Expert Testimony

Armstrong's next argument focuses on what he calls a subtle
but very significant difference between the hypothetical
question the ALJ posed to the VE and the RFC finding the ALJ
reported in his decision.  In his hypothetical, the ALJ asked
about a person who "would need to avoid . . . working frequently
or constantly with small objects really due to the visual
limitations."  Tr. 54.  In his written opinion, the ALJ stated
that Armstrong was limited to "only occasional tasks involving
manipulation of small objects."  Tr. 12.

In Armstrong's view, the ALJ's hypothetical question was
ambiguous, because it could have been construed as describing
either a visual impairment involving limited near acuity or a
physical impairment involving a limited ability for
manipulation, i.e., handling and fingering.  According to
Armstrong, if the VE construed the ALJ's hypothetical as
describing a limitation on manipulation, then his testimony
conflicted with the DOT's companion publication, Selected
Characteristics of Occupations ("SCO"), because SCO
characterizes the bagger position as requiring frequent handling

and fingering.  On the other hand, says Armstrong, if the VE
construed the ALJ's hypothetical as describing only a limitation
on near acuity, and the ALJ's RFC assessment included a
limitation on manipulation rather than or in addition to a
visual limitation, then the ALJ's RFC finding is more
restrictive than the hypothetical he posed to the VE.  Armstrong
argues that either scenario requires remand.

   Armstrong's arguments are inventive, but unavailing.  Given
the context in which the ALJ posed his hypothetical question,
the VE could not reasonably have understood the question as
proposing anything other than a visual impairment.  Thus, the
hypothesized inability to work frequently or constantly with
small objects extended no further than the degree of limitation
imposed by a deficit in near acuity.  Because the bagger job may
be performed by one having only the occasional use of near
acuity (and, necessarily, any associated limitations that flow
from limited near acuity), the VE did not testify inconsistently
with SCO when he opined that Armstrong's residual functional
capacity would allow him to perform the bagger job.  Moreover,
in the absence of any discussion of an impairment affecting
Armstrong's arms or hands in the ALJ's discussion of step two,
and in the absence of any evidence in the record supporting such
an impairment, the ALJ's reference to manipulation in his

discussion of Armstrong's RFC cannot be reasonably interpreted as anything other than an acknowledgment of a limitation resulting from and ancillary to Armstrong's visual impairment. On that basis, the ALJ's RFC finding was not more restrictive than the hypothetical question he posed to the VE.

Based on the foregoing, there is no basis for ruling that the VE offered testimony inconsistent with the DOT or that the ALJ found that Armstrong had an RFC that was more restrictive than the RFC reflected in his hypothetical questions to the VE.

C. Limitations With Respect to Workplace Rules

Armstrong's remaining argument is that the ALJ's RFC assessment is not supported by substantial evidence in the record because it does not include a finding that he needs at least occasional support to comply with workplace rules pertaining to taking breaks and complying with a dress code. As phrased, that argument is not persuasive. The ALJ's RFC did, in fact, include a requirement that Armstrong receive "direct supervision up to every 10 to 15 minutes as needed to keep [him] on task," Tr. 12, and, contrary to the assertion in Armstrong's memorandum of law, the ALJ did not "reach[ ] a conclusion that Mr. Armstrong does not need occasional support in complying with work-place rules," Cl.'s Mem. of Law, at 18.

Armstrong's argument concerning workplace rules does, however, raise another problem with the ALJ's decision.  The ALJ determined that Armstrong has the RFC to perform his past relevant work as a bagger.  Given that determination, one might wonder why Armstrong is not currently working as a bagger.  The record, of course, discloses the reason; he was fired from his bagger job for not being able to follow various work rules.  The record further discloses that his inability to follow those rules does not result from lack of effort, a bad attitude, or any cause other than his mental impairment.  Thus the following question arises: How can there possibly be substantial evidence in the record to support a conclusion that Armstrong has the intellectual ability to perform the very job from which he was fired because he lacked the intellectual capacity to perform it in compliance with his employer's work rules?

The VE testimony on which the ALJ relies, in the abstract, is useful as far as it goes, but the test of the VE's hypothesis has already been run, and Armstrong came up short.  Moreover, there is nothing in the record to suggest any kind of increase in Armstrong's intellectual ability between the time he was fired from his bagger job and the date of the ALJ's decision.  See Payne v. Astrue, No. CV-08-1753-PHX-LOA, 2010 WL 654319, at *10 (D. Ariz. Feb. 23, 2010) (citing cases for the proposition

that IQs remain relatively constant); cf. Walker, 149 F. Supp. 2d at 847 ("mental retardation is not normally a condition that improves as an affected person ages") (citing Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)).

In addition, the ALJ gave "significant weight" to the psychological evaluation performed by Dr. McNally; he reported and relied on her opinion, supported by the testimony of Armstrong and his mother, that Armstrong "would be able to perform work with proper training and guidance." Tr. 14. Dr. McNally's opinion that Armstrong "would be able to perform work" however, is not the same thing as an opinion that he is, right now, able to perform work. Moreover, in the same psychological evaluation to which the ALJ gave significant weight, Dr. McNally suggested that there is a good probability that Armstrong could return to work, if he complies with treatment, including vocational rehabilitation, in one to two years. A hypothesized contingent ability to return to work in one or two years is antithetical to a determination that Armstrong currently has the residual functional capacity to perform his past relevant work, which is the conclusion the ALJ reached in substantial reliance on Dr. McNally's evaluation.

Considering both Armstrong's firing from Hannaford, and Dr. McNally's opinion that Armstrong's return to work is at least a

year away, if not more, while also bearing in mind the impropriety of judicial re-weighing of the evidence, see Irlanda Oritz, 955 F.2d at 769; Tsarelka, 842 F.2d at 535, the court concludes that the ALJ's step-four determination that Armstrong has the residual functional capacity to perform his past relevant work is not supported by substantial evidence, see Currier, 612 F.2d at 597 (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citation omitted).

**Conclusion**

For the reasons given, I recommend that: (1) the Commissioner's motion for an order affirming his decision, doc. no. 19, be denied; and (2) Armstrong's motion for an order reversing the Commissioner's decision, doc. no. 15, be granted to the extent that the case is remanded to the ALJ for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this report and recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauth. Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir.

1992); <u>United States v. Valencia-Copete</u>, 972 F.2d 4, 6 (1st Cir. 1986).

 

 

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  February 28, 2011

cc:  Craig A. Jarvis, Esq.
     Gretchen Leah Witt, Esq.